UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS
APR 26 2004
JAMES W. McCORMACK, CLERK
By: _____ DEP CLERK

UNITED STATES OF AMERICA, ex rel
ARKANSAS HOSPICE, INC.                                PLAINTIFFS

v.           No.   4-04-CV-00419

FILED IN CAMERA AND UNDER SEAL

HOSPICE HOME CARE, INC;
HOSPICE HOME CARE OF
PINE BLUFF, PLLC;
CECILIA TROPPOLI;
THERESA TRAVIS, M.D.;
LISA THOMPSON;
BARROW ROAD CARE AND REHABILITATION CENTER, LLC
d/b/a PARKVIEW REHABILITATION AND HEALTHCARE CENTER;
PRESBYTERIAN VILLAGE, INC.;
PRESBYTERIAN VILLAGE FOUNDATION, INC.                 DEFENDANTS

## COMPLAINT FOR DAMAGES AND OTHER RELIEF UNDER THE FALSE CLAIMS ACT

Come the Plaintiffs, and for their action, state:

### JURISDICTION AND VENUE

1. This is an action to recover damages and civil penalties on behalf of the United States of America arising out of false claims presented by Defendants under the federal Medicare Program. This action arises under the provisions of Title 31 U.S.C. § 3729, *et seq.* popularly known as the False Claims Act, which provides that the United States District Courts shall have exclusive jurisdiction of actions brought under that Act.

2. Section 3732(a) of the Act provides that: "Any action under section 3730 may be brought in any judicial district in which the Defendant or, in the case of multiple Defendants, any one Defendant can be found, resides, transacts business, or in which any act proscribed by

section 3729 occurred." The acts complained of herein occurred primarily within this judicial district, and the Defendants reside and transact business primarily in this district.

3. Under the Act, this complaint is to be filed in camera and remain under seal for a period of at least sixty (60) days and shall not be served on the Defendant until the Court so orders. The Government may elect to intervene and proceed with the action within sixty (60) days after it receives both the complaint and material evidence and information from the Relator.

## SUMMARY OF ACTION

4. Defendants (directly and/or through conspiracy with one another) violated the False Claims Act because they falsely billed (upcoded) for Medicare hospice patients at the much more expensive "acute" level of care when the patients did not need or had ceased to need this short-term care; Defendants failed to provide this skilled level of care while submitting claims purporting to have provided such care; Defendants improperly solicited and obtained hospice patients by promises that they would not have to pay anything for nursing home room and board; Defendants induced nursing homes to enter into such schemes through kickbacks in the form of exorbitant payments for room and board; and, in the case of at least one nursing home, Defendants billed for hospice care provided in a nursing home that was not Medicare-certified, which is a bar to any level of reimbursement from Medicare.

## PARTIES TO THE ACTION

5. *Qui tam* Plaintiff ARKANSAS HOSPICE, INC. is a duly organized non-profit corporation, incorporated under the laws of Arkansas, and brings this action on behalf of the United States of America. It is licensed by the Arkansas Department of Health to operate a hospice business and is certified as both a Medicare and Medicaid provider of hospice services. Hereafter, it is primarily referred to as "Relator."

6. As required under the False Claims Act, 31 U.S.C. § 3730(a)(2), Relator has provided to the Attorney General of the United States and to the United States Attorney for the Eastern District of Arkansas, simultaneous with this Complaint, a statement of all material evidence and information related to the Complaint. This disclosure statement supports the existence of overcharges and false claims by the Defendants.

7. Defendant HOSPICE HOME CARE, INC. is a for-profit corporation organized and existing under the laws of the State of Arkansas. It is certified as both a Medicare and Medicaid provider of hospice services. Hospice Home Care, Inc. has its headquarters in Little Rock, Pulaski County, and is licensed by the Arkansas Department of Health to operate a hospice business. It also does business under various other names, each of which has a separate license from the Department of Health, including Hospice Home Care of Conway; Hospice Home Care of Hot Springs; Hospice Home Care of Searcy; Hospice Home Care of Pine Bluff; and Hospice Home Care of Monticello. It has a sister company organized as Hospice Home Care of Pine Bluff, PLLC. These entities are all interconnected, owned and operated by Defendants Troppoli and Travis and will be referred to collectively herein as Hospice Home Care or *HHC*. HHC operates in over 30 counties of Arkansas and claims to provide services to approximately 450 patients a day in private residences and nursing homes.

8. Defendants CECILIA TROPPOLI and her sister THERESA TRAVIS, M.D. are residents of Pulaski County, Arkansas, and own and operate HHC. Troppoli is the president and chief executive officer and Travis is the executive medical director.

9. Defendant LISA THOMPSON, a resident of Pulaski County, Arkansas, has been the marketing director for HHC and is now Chief Operating Officer.

10. All the acts set out herein by HHC were devised and approved by Troppoli, Travis, and Thompson and were done in their capacities as owners, operators, board members, and officers of HHC.

11. Defendant BARROW ROAD CARE AND REHABILITATION CENTER is a limited liability company organized under the laws of Arkansas. It does business as PARKVIEW REHABILITATION AND HEALTHCARE CENTER in Little Rock, Pulaski County. It is licensed by the State of Arkansas as a nursing home and certified by both Medicare and Medicaid.

12. Defendants PRESBYTERIAN VILLAGE, INC. and PRESBYTERIAN VILLAGE FOUNDATION, INC. are organized under the laws of Arkansas and operate Presbyterian Village, which is licensed as a nursing home by the State of Arkansas. It is neither Medicare nor Medicaid certified.

## LEGAL STANDARDS GOVERNING HOSPICE CARE

13. Medicare is a federally funded health insurance program primarily for the elderly. Medicare was created in 1965 in Title XVIII of the Social Security Act. Medicare has several parts, including Part A, which covers hospital, home health, nursing facility, and hospice care.

14. From HHC's inception in about September 1994 to the present time, it has received a major portion of its funds from the United States Government through provisions of the federal Medicare Program. The amount of funds received was and is governed under regulations promulgated by the Centers for Medicare and Medicaid Services (CMS), which provide for payments to hospices caring for Medicare-qualified patients.

15. Hospice care is provided through Medicare when the patient is eligible for Medicare Part A; the patient's doctor and the hospice medical director certify that the patient is terminally

4

ill and likely has less than six months to live. The patient signs a statement choosing hospice care rather than curative treatments. If the patient lives longer than six months, he or she can continue to receive hospice care as long as a doctor recertifies that the patient is still terminally ill with a life expectancy of less than six months.

16. The hospice agency is required to be certified by Medicare to receive Medicare payments. Under Medicare statutes and regulations, it must establish a plan of care for each patient based on that patient's specific needs. The services may include physician services, nursing care, medical equipment and supplies, medications for symptom control and pain relief, home health aide and homemaker services, physical and occupational therapy, speech therapy, social work services, dietary counseling, grief and loss counseling for the patient and family, spiritual counseling, and short-term in-patient care.

17. Applicable provisions of federal regulations at 42 C.F.R. Part 418 and other federal regulations and statutes provide for payments to hospice agencies. These payments are based upon the level of care required by the hospice patient.

18. There are four levels of hospice care: (1) routine home care; (2) continuous care; (3) inpatient respite care; and (4) general inpatient ("acute") care. Levels 1 and 4 are at issue in this case. Level 1 is commonly called "routine" care, and hospices may provide this level of care not only in private residences, but also in nursing homes and stand-alone hospice facilities. Level 4 general inpatient care is sometimes called "acute" care. It must be provided in a Medicare-certified hospice facility, hospital, or skilled nursing facility (42 C.F.R. § 418.98) with a registered nurse on-site to provide direct patient care 24-hours a day (42 C.F.R.§ 418.100(a)(2).

19. This Complaint focuses specifically on improper billing of the general inpatient ("acute") level of care for hospice residents who are in nursing homes.

20. In the current fiscal year (2003-2004) Medicare pays One Hundred Fifteen Dollars and Twenty-seven Cents (**$115.27**) per day for "routine care" in Pulaski County, Arkansas (the amount varies slightly per geographic area). In the 2002-2003 fiscal year, Medicare paid One Hundred Ten Dollars and Forty-six Cents ($110.46) per day.

21. If a hospice is providing "routine" care to the patient in a nursing home, the patient is responsible for paying the nursing home's room and board charges. Medicare has no provision for payment of room and board at this level of care because the majority of patients receive such care in their own homes.

22. To qualify for "general inpatient" or "acute" care, a patient must be in a free-standing hospice, a hospital, or a nursing home *"for pain control or acute or chronic symptom management which cannot be managed in other settings."* 42 C.F.R. § 418.302(b)(4). This level is intended to be short-term. 42 C.F.R. § 418.98. For the current fiscal year (2003-2004), Medicare pays Five Hundred Thirteen Dollars and Sixty-five Cents (**$513.65**) per day for general inpatient care, which includes the cost of room and board. In fiscal year 2002-2003, Medicare paid Four Hundred Ninety-Two Dollars and Fifty Cents ($492.50) per day. These amounts are for Pulaski County, Arkansas (the amount varies slightly per geographic area).

23. Because the general inpatient ("acute") level of care for hospice patients in nursing homes includes the cost of room and board, the hospice is responsible for paying the nursing home its usual room and board charges out of the amount the hospice receives from Medicare.

24. The hospice, including its medical director, is charged with the primary responsibility of determining the correct level of care for a patient through the patient's plan of care and the involvement of an interdisciplinary care team.

25. In summary, a hospice is paid a specified rate for each Medicare-qualified patient it treats. These funds are paid by the United States Government through its federal Medicare Program. The reimbursement rate per patient is determined by the level of care required by the patient – routine or general inpatient care.

26. A hospice may provide general inpatient services to a patient in a nursing home setting only if that nursing home is Medicare certified. 42 C.F.R. § 418.98.

27. Even when a patient is in a nursing home, the hospice is responsible for the patient's hospice care at all times. 42 C.F.R. § 418.58.

28. All arrangements between the hospice and the nursing home for care of hospice patients must be contained in a detailed and legally binding written agreement. 42 C.F.R. § 418.58(e).

29. For general inpatient ("acute") care, the hospice must ensure that all of its hospice patients in a nursing home receive 24-hour direct care from a registered nurse. 42 C.F.R. § 418.100(a)(2). This requirement is to ensure that the hospice patient receives prescribed treatments, medications, and diet; is kept comfortable and clean; and is protected from injury and infection. Thus, a registered nurse who provides direct *"skilled care"* must be present on each and every shift.

30. As a condition of participation, hospices may provide care at the general inpatient level only for "short term" periods and only when medically indicated. The specific circumstances

allowed by the regulations are "pain control," and "symptom management." 42 C.F.R. § 418.98 (a).

31. The CMS Medicare Benefit Policy "Hospice Manual" offers further guidance under the heading "***Short-Term*** Inpatient Care":

> General inpatient care may be required for procedures necessary for pain control or *acute* or chronic symptom management that cannot feasibly be provided in other settings. *Skilled nursing care* may be needed by a patient whose home support has broken down if this breakdown makes it no longer feasible to furnish needed care in the home setting. ... [A] *brief* period of general inpatient care may be needed in some cases when a patient elects the hospice benefit at the end of a covered hospital stay. If a patient in this circumstance continues to need pain control or symptom management which cannot be feasibly provided in other settings *while the patient prepares to receive hospice home care*, general inpatient care is appropriate. Other examples of appropriate general inpatient care include a patient in need of medication adjustment, observation, or other *stabilizing* treatment, such as psycho-social monitoring, or a patient whose family is unwilling to permit needed care to be furnished in the home.
> CMS Medicare Benefit Policy Manual, Chapter 9, § 40.1.5 (emphases added).

32. Thus, a hospice is only allowed to bill the more expensive general inpatient level for brief periods when a patient is in an acute stage, needs stabilization, or is in transition.

33. If the hospice patient does not qualify for the general inpatient level of care, then the patient receives routine care, and the patient or his/her family must pay the cost of room and board charged by the nursing home, which is usually between One Hundred Dollars ($100) and Two Hundred Dollars ($200) per day, a market rate driven by Medic*aid*, which pays for the vast majority of nursing home care, and thus determines the value of a nursing home's room and board.

34. Nursing homes frequently enter into an exclusive arrangement with a particular hospice for the hospice to provide hospice care in that nursing home to those patients who qualify.

8

However, the federal government has warned that payments made by the hospice to the nursing home for room and board provided to a hospice patient should not exceed what the nursing home otherwise would have received if the patient had not been enrolled in hospice. In other words, the hospice may only pay fair market value for room and board; the rate paid by Medicaid is commonly considered the benchmark. The same rule applies to any other services provided by the nursing home and paid for by the hospice.

35. Paying above fair market value in such circumstances is a violation of the Antikickback Act (42 U.S.C.§ 1320a-7b(b)) (i.e., a kickback to the nursing home) and also constitutes a false claim through overutilization. More specifically, kickbacks create a larger pool of hospice patients in nursing homes, which in turn generates higher gross revenues per patient because hospice patients in nursing homes have, on average, longer lengths of stay than hospice patients in their own homes; and the kickback distorts medical decision making with an adverse effect on quality of care. (OIG Special Fraud Alert, March 1998)

36. The OIG has strongly warned against such arrangements, including in Notice, *Fraud and Abuse in Nursing Home Arrangements with Hospice*, 63 Fed. Reg. 20415, April 24, 1998; and Special Fraud Alert, *Fraud and Abuse in Nursing Home Arrangements with Hospices* (March 1998).

## FACTUAL ALLEGATIONS

37. Since at least 2003, HHC has been marketing its program within nursing homes as cost-free to patients as to both hospice care and nursing home room and board. HHC makes it cost-free by billing care at the general inpatient "acute" level as a matter of course, regardless of whether the patient meets the acuity level required for this level of care under the law. Thus,

HHC patients are not required to pay room and board as they are when being served by other hospice programs in nursing homes.

38. Relator has also learned that since at least 2003, HHC has been entering into exclusive arrangements with Defendant Parkview Rehabilitation & Healthcare Center, Defendant Presbyterian Village and other nursing homes in which it pays the nursing home approximately $300 to $350 per day for each hospice patient admitted to the nursing home. HHC solicits the nursing home by offering this additional money without requiring any increased services from the nursing home in return. Thus, this amount is far in excess of fair market value. Because the amount is so much higher – approximately three times higher – than what Medicaid (or other hospice agencies) would pay, the nursing homes have been enticed to enter into these arrangements.

39. Without the above-described kickback, many of HHC's hospice patients would have received the less expensive and medically proper "routine" care in a different facility or at home.

40. Relator's employees explained to Parkview and Presbyterian Village nursing home officials that these arrangements are not permissible, and even took a copy of the regulations to Presbyterian Village, but the nursing homes entered into the arrangements with HHC in spite of these explanations.

41. Relator also explained to Presbyterian Village on or about December 2003 that Presbyterian Village could not enter into any such arrangements with a hospice agency because Presbyterian Village was not Medicare certified. Presbyterian Village entered into the arrangement with HHC anyway, in direct violation of federal regulations

42. A condition for payment under the hospice program is Medicare certification (42 C.F.R. § 418.98). Medicare would not have paid any of the general inpatient claims for hospice

patients at Presbyterian Village if it had known that the care was being provided in a non-certified facility.

43. HHC has led referral sources to tell patients and their families that if they choose HHC, they can receive care without paying anything, but if they choose Arkansas Hospice (Relator) they will have to pay a "co-pay" for room and board. As explained in a handout provided by one major referral source, "There is no out-of-pocket expense" when a patient goes to Parkview or Presbyterian Village (contracted to HHC) because "the **acute** Medicare hospice benefit is what Hospice Home Care usually bills." The handout also states that if the patient or family chooses Arkansas Hospice facilities, they will have to pay a "co-pay" of $125 per day because Arkansas Hospice will bill for the "**regular** [routine] Medicare hospice benefit." See **Exhibit A**, a handout provided to patients and families by the UAMS Medical Center (emphases in original). The hand-out goes on to explain that if the patient improves, HHC "may eventually have to use the regular hospice benefit *but this is not common...*" (emphasis added).

44. Similarly, HHC officials directly tell patients or their families that if they will sign with HHC, that they will be general inpatient the entire time and will have no extra charges. When these patients confront Arkansas Hospice (Relator) about the price difference, Arkansas Hospice's employees explain that Arkansas Hospice cannot legally offer the same arrangement.

45. Not only does HHC bill for general inpatient care even when the patients never did qualify or have ceased to qualify, but it often fails to actually provide the higher level of care. More specifically, even while improperly qualifying patients for general inpatient care, HHC often fails to provide the required services for this level, particularly the 24-hour direct care by a registered nurse, yet it continues to bill Medicare for such care.

11

46. Relator has received numerous calls from families who wished to transfer their loved one to Relator because the patient was not receiving the acute care the family had been promised by HHC if they placed their relative in a nursing home contracted to HHC.

47. Though some nursing homes have recognized the illegality of such arrangements and have declined solicitations from HHC, Relator is informed and believes that HHC has similar arrangements with other nursing homes in the state. The arrangement with Presbyterian Village was apparently discontinued in April 2004, though the hospice patients at that facility were then transferred by HHC to Parkview.

48. The claims and related documentation associated with a large number of the Medicare patients treated by HHC during the period herein specified were predominantly false and fraudulent (and continue to be false and fraudulent) in that they were submitted to secure the most money possible from Medicare, rather than to secure the amount that should have been properly paid based upon a correct level of care and permissible arrangements with the nursing homes.

49. Relator is further informed and believes that other such arrangements are being executed.

50. Relator has no desire to harm a competitor, and indeed, welcomes fair and lawful competition. However, it has received consistent reports not only of false billing and improper contracting by HHC, but also of situations in which families felt their loved ones received inadequate care at this crucial, end-stage of their life.

51. All monies received from the false claims were paid to and received by Defendant HHC, though HHC used some of the money to turn around and pay the nursing homes far above

fair market value for room and board and/or for services not actually provided, such as 24-hour RN direct care.

52. From at least 2003 to the present, Defendants knowingly defrauded the United States Government by submitting claims (and preparing supporting documentation) that: (a) falsify the medical necessity, i.e., the level of care required, by hospice patients who were obtained through kickbacks and illegal marketing; (b) falsify the level of care actually provided (upcoding); (c) falsify compliance with Medicare certification requirements for hospice care in nursing home settings; and (d) otherwise falsify the claims for reimbursement submitted to the federal Medicare Program.

53. According to Relator's best estimate, it appears that HHC is falsely billing Medicare for the more expensive hospice general inpatient level of care on as many as 10 to 20 patients per day, resulting in fraudulently obtained overpayments ranging from $1,500,000 to $3,000,000 or more per year, which is subject to trebling under the False Claims Act and the statutory penalty of $11,000 per claim. This estimate is based on patients at Parkview nursing home, thus the amount is even greater when billings from patients at Presbyterian Village and other nursing homes are included.

## COUNT I

### 31 U.S.C. § 3729(a)(1) and (2)

54. Plaintiffs re-allege and incorporate the allegations contained in paragraphs 1 through 53 as if fully set forth herein.

55. Through the acts described above and otherwise, Defendants and their agents knowingly presented or caused to be presented to agents of the United States Government false

or fraudulent claims in order to obtain reimbursement for health care services, thereby causing damage to the United States Treasury, in violation of 31 U.S.C. § 3729(a)(1).

56. Through the acts described above and otherwise, Defendants and their agents knowingly made, used, and/or caused to be made or used false records or statements in order to get a false or fraudulent claim paid by the United States Government, in violation of 31 U.S.C. § 3729(a)(2).

## COUNT II

### 31 U.S.C. § 3729(a)(3) Conspiracy

57. Plaintiffs re-allege and incorporate the allegations contained in paragraphs 1 through 56 as if fully set forth herein.

58. Through the acts described above and otherwise, Defendants and their agents entered into a conspiracy or conspiracies among themselves and with others to defraud the United States by getting false or fraudulent claims paid. Defendants have also conspired to omit disclosing or to actively conceal facts which, if known, would have reduced Medicare payments to them or resulted in repayments from them to Medicare. Defendants have taken steps in furtherance of those conspiracies, *inter alia,* by preparing and submitting false claims for payment. The United States and its fiscal intermediary were unaware of Defendants' conspiracies and the falsity of the records, statements, and claims made by Defendants and their agents, and as a result thereof, have paid and continue to pay Medicare reimbursements that they would not otherwise have paid, as intended by Defendants. By reason of Defendants' conspiracies and the acts taken in furtherance thereof, the United States has been damaged in the amount of millions of dollars in Medicare funds.

## PRAYER FOR RELIEF

Plaintiffs demand judgment against the Defendants and each of them as follows:

    a. That by reason of the violations of the False Claims Act, this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States Government has sustained because of Defendants' actions, plus a civil penalty of not less than Five Thousand Five Hundred Dollars ($5,500.00) and not more than Eleven Thousand Dollars ($11,000.00) for each violation of 31 U.S.C. § 3729;

    b. That Relator, as a *qui tam* Plaintiff, be awarded the maximum amount allowed pursuant to Section 3730(d) of the False Claims Act and/or any other applicable provision of law;

    c. That Relator be awarded all costs of this action, including attorney's fees and court costs;

    d. That Plaintiffs be granted a trial by jury; and

    e. That Plaintiffs have such other relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED,

Mitchell, Blackstock, Barnes,
  Wagoner, Ivers & Sneddon, PLLC
1010 West Third Street
Little Rock, AR 72201
(501) 378-7870

_____
Michael W. Mitchell, ABN 69052
David Ivers, ABN 92005
*Attorneys for Relator-Qui Tam Plaintiff*

(Place MR Label Here)
MR #
Patient's Name
Patient's Address

**UAMS MEDICAL CENTER**

**Progress Notes**

(Sign and date all notes)

02/02/04 (1630) CCC / SCWK: Hospice Options

Please read the attached information on inpatient hospice options in the LR area. AR Hospice has a waiting list of 4 @ Ft. Roots (semi pvt rooms) and 9 @ Doctors (pvt rooms). Hospice Home Care can accept ████████ @ the Parkview Center (pvt rooms in most cases) with 1 day notice; they do not feel their Presbyterian Center could meet her needs.

Paula Ellington, Social Worker @ Washington Regional Hospice (479-713-7385) was not able to recommend any one specific nursing home, but said they have worked with City Hospital Nursing Home for a long time. If you are interested, you should call their social worker (Sue Rickett) and ask the specific questions about family staying with patient, etc. (479-442-5100).

Again, if you pursue a nursing home in the Fayetteville area, Mrs. ██████ will be a Long-Term Medicaid resident with hospice supporting her care. If she was at any of the three inpatient sites in Little Rock, she would not be in a Long-Term Medicaid bed but rather a hospice bed (either under the regular hospice benefit or the acute hospice benefit---as explained on attached page). These inpatient hospice services are not available outside of the Little Rock area (yet).

Any of these sites will have a Medical Director available for ████████'s day to day needs in addition to the Medical Director of the hospice (plus Dr. Shah can remain accessible as a consultant if needed).

Please talk over these options with your siblings, tour the sites you are interested in, and let me know which sites you would like referrals sent to.

I hope this is helpful,    *Cynthia Webster, LMSW*
Cynthia Webster, LMSW
501-686-5870


Med Rec 7 (02/97)



The **regular Medicare hospice benefit** pays approximately $100 daily for every patient (to cover all comfort meds, equipment, and care). This is true whether the patient is at home or in a center. Arkansas Hospice has determined that it actually costs approximately $225 daily to provide inpatient care, so that leaves a $125 daily copay. If there is a financial hardship, they can lower that copay (sliding scale fee). There is also a $200 deposit due at admission. Again, this is based on a family's ability to pay and no patient is ever denied care based upon their inability to pay for the care.

The **acute Medicare hospice benefit** is what Hospice Home Care usually bills under at their inpatient centers at Parkview and Presbyterian Village. This reimburses at a rate that fully covers their care. There is no out-of-pocket expense. If a patient improves, the hospice may eventually have to use the regular hospice benefit but this is not common and Hospice Home Care will work with the family to ensure as little out-of-pocket expense as possible. At this point, they will help the patient to either become a Medicaid nursing home patient with hospice or private pay nursing with hospice. Jody Richardson is the contact person at Parkview and is happy to schedule tours and help with admission paperwork (501-224-4173). Natalie at Hospice Home Care is the contact person for Presbyterian Village in Little Rock (501-296-9043). Like Arkansas Hospice, Hospice Home Care does not deny care to patients based upon their financial status or lack of insurance.

FYI, Arkansas Hospice often admits a patient under the acute hospice benefit, but they may only keep them under the acute benefit for a few days. Then, the $125 daily copay issue takes effect. If the patient is very fragile and could die within a few days to a week, and there is a waiting list at both AR Hospice Centers, we can ask them to eval the patient for an Acute Hospice bed at St. Vincent's Hospital. This is really geared for patients who are "actively dying" and if they improved, they might have to go through another move into one of the two AR Hospice Centers (when a bed became available).

It is very important to note that AR Hospice does not consider the patient to be on the waiting list until the UAMS Doctor signs their hospice forms AND the family has completed admission paperwork with the hospice nurse.

*The care provided by either hospice is excellent.*

**All of this information is correct to the best of my knowledge, but you should always confirm the info with the respective organizations. I hope this information will assist you in choosing the best hospice center for your family.**

Cynthia Webster, LMSW
501-686-5870